(990 P.2d 759)

No. 80,396

RAYMOND REDDITT (deceased), *Appellee,* v. MCDONALD'S RESTAURANT, *Appellant.*

—

Opinion filed October 8, 1999.

*Brian J. Fowler,* of Evans & Dixon, of Kansas City, Missouri, for appellant.

*James E. Martin,* of Law Offices of James E. Martin, of Overland Park, for appellee.

Before BRAZIL, C.J., KNUDSON, J., and JAMES P. BUCHELE, District Judge, assigned.

BUCHELE, J.: McDonald's Restaurant appeals a decision of the Workers Compensation Board (Board) holding Madie Redditt, widow of Raymond Redditt, was entitled to death benefits under K.S.A. 1998 Supp. 44-508(c)(2). Raymond died on November 16, 1995, due to personal injury by an accident arising out of and in the course of his employment.

Raymond and Madie Redditt were married on April 19, 1969, in the state of Tennessee. The couple first separated in 1972. At

that time, Madie moved in with her mother who lived in Tennessee. They reunited briefly and then separated again in early 1973.

In March 1973, Madie filed for divorce in Memphis, Tennessee. At the time she filed for divorce, she was living with her mother. Shortly thereafter, Madie moved to Kansas City, Missouri, to live with her aunt. Raymond continued to live in Memphis. The last time they lived together as husband and wife was in March 1973.

From March 1973 through 1979, Madie lived with her aunt in Kansas City, Missouri. Occasionally, Madie would return to Tennessee to visit family. During these visits, she would also visit Raymond. In 1978, they discussed "getting back together" during one of her trips to Memphis. However, Madie left to go back to Kansas City to return to her employment. During the period 1973 to 1979, Madie did not seek support from Raymond.

From 1975 through 1979, Madie had sexual relations with two other men in addition to Raymond. On May 26, 1979, Madie gave birth to a son in Kansas City, Missouri. Madie testified the birth certificate was silent as to the identity of the father, because she had sexual relations with both Raymond and one of the other men during the time period she conceived. She is unable to determine which of the two men actually fathered her child.

After Jason's birth in 1979, Madie left her job in Kansas City and moved back to Memphis to live with her mother. After a brief period, she took up a separate residence in Memphis in 1979. Occasionally, she would have contact with Raymond in the early 1980's. However, the two never again lived as husband and wife. The last possible physical contact she had with Raymond was in 1985, before he moved to Kansas City. The last voice contact Madie had with Raymond was a phone call in 1986. Raymond called her to discuss an issue concerning one of their children. Other than that one phone call, Madie had no contact at all with Raymond from 1985 until his death in November 1995. Madie had no involvement in making Raymond's funeral arrangements.

The Board's ruling raises two issues on appeal. First, the Board found that Raymond was the first party to leave the marital relationship and since Madie did not desert or abandon the marriage, she was entitled to the death benefits of $200,000 as the surviving

spouse. Second, the Board ruled that since Raymond was the abandoning party to the marriage, it was not necessary to reach the issue of whether a mutual abandonment of the marital relationship fulfills the requirements for desertion or abandonment under K.S.A. 1998 Supp. 44-508(c)(2).

In determining eligibility for benefits, the Workers Compensation Act (Act) specifically defines "members of a family" in K.S.A. 1998 Supp. 44-508(c)(2) as the surviving legal spouse and children. The definition then provides a priority list if no such individuals exist. However, the Kansas Legislature has not given the surviving legal spouse an absolute right to benefits. K.S.A. 1998 Supp. 44-508(c)(2) provides in relevant part:

"In the meaning of this section, a surviving spouse shall not be regarded as a dependent of a deceased employee or as a member of the family, if the surviving spouse shall have for more than six months willfully or voluntarily deserted or abandoned the employee prior to the date of the employee's death."

In Kansas, proof of dependency by a surviving spouse is not required. In *Brinkmeyer v. City of Wichita*, 223 Kan. 393, 397, 573 P.2d 1044 (1978), the Kansas Supreme Court concluded that the 1974 amendments to K.S.A. 44-510b made no provisions for the payment of compensation to *partially* dependent spouses or children. The changes in the statute's wording appeared to provide benefits only to "surviving spouses" and "wholly dependent children." The *Brinkmeyer* court concluded that by enacting the 1974 amendments to K.S.A. 44-510b,

"the legislature intended not to deprive a partially dependent surviving spouse of the benefits available under the . . . act . . . .

. . . .

"[A] surviving legal spouse is conclusively presumed to be wholly dependent upon the deceased workman, and is entitled to the benefits provided by the act for a surviving legal spouse, without proof of dependency." 223 Kan. at 397.

Therefore, proving financial dependence or any other type of actual dependence or support of the surviving spouse of the deceased employee is not necessary for the surviving spouse to still be entitled to benefits under the Act.

In *Tisdale v. Wilson & Co.*, 141 Kan. 885, 43 P.2d 1064 (1935), the court faced an issue similar to the case at bar. The court con-

sidered whether the widow of a deceased worker had abandoned her husband, as addressed in R.S. 1923, 44-508 (1933 Supp.) and, thereby, excluded herself from receiving death benefits. The statutory provision concerning abandoning spouses has not substantively changed since 1933. R.S. 1923, 44-508 (1933 Supp.) defined "members of a family," especially as to separation of husband and wife: "In the meaning of this section a widow shall not be regarded as a dependent of a deceased workman or as a member of the family, if she shall have for more than six months willfully or voluntarily deserted or abandoned him prior to the date of his death."

The *Tisdale* court determined that in a case of established facts, the issue of whether an abandonment occurred is a question of law, and the court looked to several different sources to define abandonment.

"Webster's New International Dictionary, 2d ed., defines abandonment as 'Desertion by a husband or wife of his or her consort with the intention of creating a permanent separation.'

"Bouvier's Law Dictionary, 3d ed., defines abandonment as follows:

" 'By Husband or Wife. The act of a husband or wife who leaves his or her consort willfully, and with an intention of causing perpetual separation.'

"19 C. J. 56 defines abandonment as used in connection with divorce proceedings as follows:

" 'Desertion or abandonment consists in the voluntary separation of one spouse from the other for the prescribed time without the latter's consent, without justification, and with the intention of not returning.' " 141 Kan. at 890.

The *Tisdale* court focused on the intentions of the parties regarding the marital relationship. The wife moved out of the family residence. However, the evidence indicated that several family members and their spouses were living with the wife and husband. The wife testified that she told the husband she would come back when he got a place for just the two of them. She also testified that the husband visited frequently, the couple talked about living together again, the separation was mutual, and he gave her money from time to time. In granting the surviving spouse benefits, the court found evidence that the wife intended the separation to be only temporary, and therefore she did not have the requisite intent to abandon the marriage. 141 Kan. at 890.

In the case at bar, the Board relied on *Tatum v. Tatum,* 736 P.2d 506 (Okla. 1982), for authority that since Raymond was the deserting spouse, Madie was not required to actively seek a reunion or reconciliation of the marriage to be eligible to receive benefits under the Act. In *Tatum,* the first wife (Florine) claimed to occupy the status of the surviving spouse under the workers compensation law although she was living alone at the time of her husband's death by reason of desertion and the couple had been separated for over 6 years. The court rejected the contention raised by the second wife of a subsequent common-law marriage that the first wife lost her status as a deserted spouse by inaction and nonpursuit. The *Tatum* court affirmed the trial court's finding that the first wife was the decedent's deserted surviving spouse entitled by statute to benefits, but the court did not foreclose the possibility that a deserted spouse could lose death benefits. 736 P.2d at 508-09.

"A deserted spouse is not required to 'dog' her husband's footsteps in an endless quest to achieve reunion. By his established lifestyle the husband revealed a predisposition to wandering, short-term employment, discontent with jobs and instability. Florine's own job and the house she had purchased no doubt represented her only security. The law would indeed be both inastute and unrealistic if it expected a wife to abandon her only precious possessions in a fruitless quest after an errant husband who had given no indication of his desire to return and stay. Florine's status as a deserted spouse was not lost either by inaction or non-pursuit. Affirmative acts, such as suing for divorce or separate maintenance, active resistance to reconciliation efforts, or cohabitation with another may be indicative of a changed character in the spousal relationship. They are all absent in this case. A legal change might also manifest itself through a formal separation agreement, refusal to join the spouse whenever the opportunity may arise, or some other outward recognition that the marriage relationship had come to an end. Florine did none of these things." 736 P.2d at 508-09.

The Kansas Legislature, in its wisdom, has made it difficult for widows, widowers, and children to be precluded from benefits under the Act by providing that any member of the deceased's family, whether wholly or in part dependent upon the employee at the time of the death, is entitled to benefits. However, by clarifying the ability of the surviving spouse to recover, the legislature has made it clear that surviving spouses who willfully or voluntarily deserted or abandoned the deceased employee for more that 6

months prior to the employee's death shall not be entitled to benefits. K.S.A. 1998 Supp. 44-508(c)(2). This is sound public policy. Certainly there is no reason why an abandoning spouse who is intentionally separated from the deceased employee and has neither received nor sought any financial, emotional, or physical support from the deceased employee should upon the death of the employee receive benefits that are intended to compensate for what the deceased was providing or should have been providing.

The Board found that claimant left the marriage temporarily in 1972, and the parties reconciled after a brief separation. In March 1973, Raymond left the marital relationship to live with another woman. From that point forward, the couple never again lived together as husband and wife, and, specifically, the Board found the couple did not reconcile the marriage in 1979 or thereafter. The Board found the March 1973 departure made him "the first to leave the marital relationship."

The Board in its majority decision recognized that under Kansas law an abandonment may be an actual abandonment by the claimant or a mutual abandonment by both parties:

> "With proof of dependency not being deemed necessary to award a surviving spouse benefits under the Act and with the marriage between claimant and the decedent being a valid marriage at the time of death, the Appeals Board must examine the record to determine if the evidence points to an actual abandonment of the marital relationship by claimant or a mutual abandonment of the marriage by both parties."

Having found that the "decedent was the first to leave the marital relationship," as he left to live with another woman in 1973, the Board found him to be the abandoning party and did not address the issue of mutual abandonment. The Board's decision rests upon a narrow interpretation of K.S.A. 1998 Supp. 44-508(c)(2) that only willful acts of a surviving spouse will foreclose awarding of death benefits. The Board relied upon *Tatum*, which we believe is factually distinguishable from the case at bar. In *Tatum*, there were clearly no signs, from the standpoint of the loyal wife, that the relationship had changed or other outward recognitions that the marriage had come to an end.

We believe that the Board's decision that decedent departed from the relationship in 1973 should not, standing alone, be determinative of whether claimant is eligible for benefits as a surviving spouse in 1995. Whether there may have been a mutual abandonment of the marital relationship through the passing of time must also be examined.

Other jurisdictions have found a mutual abandonment should deny a surviving spouse's right to benefits. In *Estate of Garcia v. Industrial Com'n*, 156 Ariz. 39, 749 P.2d 948 (1988), the couple was married in 1976 and had a stormy first 2 years of marriage. During this period, the husband physically abused the wife. Then in 1978, after a particularly violent quarrel, the husband left the marital home and never returned. After a 5-year separation, the husband entered into a "marriage relationship" with another woman and fathered a child. Meanwhile, the wife had lived with two different men at two separate times during the separation. The husband was killed in an on-the-job accident, and the wife filed for death benefits. At that point, the couple had lived apart for approximately 7 years.

Except for a time limitation, the Arizona statute on death benefits for a surviving spouse is similar to its Kansas counterpart. Ariz. Rev. Stat. Ann. § 23-1064(A)(1) (1995) provides: "The following persons are conclusively presumed to be totally dependent for support upon a deceased employee:  . . . A wife upon a husband whom she had not voluntarily abandoned at the time of injury." The *Garcia* court refused to award the wife any death benefits under a theory of mutual abandonment. The court relied on several facts in holding that the couple had accepted the separation and started a new life: (1) The couple had been separated for approximately 7 years before his death; (2) during this period, the husband had entered into an informal "marriage" relationship with another woman and fathered a child; (3) the wife had lived with two different men on two separate occasions during this separation; and (4) the husband provided no monetary or other sustenance to the claimant after the separation. 156 Ariz. at 41. The court stated:

"As one noted commentator explained, '[e]ven when the initial separation was involuntary and blameless, it may become converted over a long period of time

into constructive desertion by the mutual acceptance of the separation and the deliberate assumption of new relationships.' 2 A. Larson, *Law of Workmen's Compensation*, § 62.43 (1987). In *Brezickyj v. [Eastern R. R. Builders, Inc.*, 397 N.Y.S.2d 452, 59 App. Div. 2d 578 (1977)], the court refused to allow a surviving spouse to recover death benefits under a statute substantially similar to the one at issue here. The husband and wife had been involuntarily separated for twenty years, and the court concluded that, because each had countenanced the separation, there had been a mutual abandonment subsequent to the original involuntary separation. *Id.* 397 N.Y.S.2d at 453-54; *see also*, Larson at § 62.43. Under the facts presented here, this long separation, countenanced and recognized by both, clearly lapsed into an ignored marital status. See *Brezickyj*, at 454. We conclude, as did the *Brezickyj* court, that this ignored marital status created a mutual abandonment between the claimant and the deceased. *Id.*

"The spirit and purpose of the workers' compensation law compels such a result. The law is primarily social legislation designed to compensate workers and their dependents injured or killed in the course of their employment in order to prevent them from becoming public charges. *See generally Stephens v. Textron, Inc.*, 127 Ariz. 227, 619 P.2d 736 (1980); *Prigosin v. Industrial Comm'n*, 113 Ariz. 87, 546 P.2d 823 (1976). There is no question here from the evidence presented that the claimant has lived for at least seven years without the decedent's support and as if the decedent had never existed. To find her eligible for death benefits in this type of situation would be to provide support for her where none had been sought or received before." 156 Ariz. at 41-42.

In *Brezickyj v. Eastern R. R. Builders, Inc.*, 397 N.Y.S.2d 452, 59 App. Div. 2d 578 (1977), the court found a similar abandonment created over a period of 20 years. The couple was married in the U.S.S.R. in 1938. They were separated when the husband was conscripted and taken to Germany by the retreating German Army in 1944. The couple never saw each other again. The husband made his way to the United States where he found work until his death in 1964. The wife remained in the U.S.S.R. and had two children with another man.

The New York Workmen's Compensation Board held the wife was the surviving wife of the decedent and entitled to benefits. The *Brezickyj* court reversed the Board's decision and held the couple had mutually abandoned the marital relationship. The New York law in this area is substantially the same as Kansas law, except for the time limitation. To be eligible for death benefits in New York, the claimant must be a surviving wife who had not abandoned her husband. See N.Y. Workers' Compensation Law § 16 (1-a), (2)

(McKinney 1993). The *Brezickyj* court found the original separation clearly did not meet the classic definition of abandonment which contemplates a voluntary separation by one party from the other without justification with the intention of not returning. 397 N.Y.S.2d at 453. The court stated:

"The separation, even if it began by compulsion, continued to subsist by apparent mutual consent. Faced with the grim realities of life and the 'cold war' between the Communist and Western Countries, the claimant and the decedent each began a new life. He sought and found gainful employment and sought and obtained permanent residence in this country. There is no evidence in this record that the decedent ever provided any monetary or other sustenance to the claimant, although she claimed to have received some letters from him which she lost. She, on the other hand, began a new life with another man by whom she had several children. Their separation, countenanced and recognized by both, lapsed into an ignored marital status. Realistically, we must conclude that the parties created a mutual abandonment even though it was not voluntary in its inception.

"The board, in applying the very literal definition of abandonment, found that claimant was a surviving wife and therefore was entitled to the death benefits. The Workmen's Compensation Law is social legislation designed to secure to workers and their dependents compensation when they are injured or killed in the course of their employment, without regard to fault. Although it is true that a surviving wife need not prove her actual dependency, it can hardly be said under the facts of this case that the claimant was a dependent in any sense of the word. To find the claimant herein eligible for death benefits is to provide support for her, which decedent had not done for over 20 years." 397 N.Y.S.2d at 453-54.

The current case presents a scenario where the parties had been separated over 20 years, living several hundred miles apart most of the time, and having no direct contact at all between 1986 and decedent's death in 1995. Claimant had a child in 1979 and did not name a father on the birth certificate and testified that the child's biological father could have been one of two men other than the decedent. Decedent had not provided claimant with financial support during the 10-year period before his death. The parties filed separate income tax returns. Claimant listed herself as "single" on credit applications and her child's school records. The claimant was not involved in making decedent's funeral arrangements.

We believe that the facts of this case require that a finding be made as to whether there was a mutual abandonment of the marital relationship. The Board acknowledged that mutual abandonment

should be considered under K.S.A. 1998 Supp. 44-508(c)(2) but stopped short of doing so.

Abandonment is not a static concept and should not be determined from a single act. Although this case presents the existence of a legal marriage, consideration should be given to the parties' conduct and circumstances over time to determine their intent. See *Tisdale*, 141 Kan. at 890; *Tatum*, 736 P.2d at 508-09. Mutual abandonment may result even though one party may have instigated the separation and be at fault for the parties' estrangement.

We remand this case to the Board to address the issue of mutual abandonment under K.S.A. 1998 Supp. 44-508(c)(2).

Remanded with directions.